IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| **NYREE WRIGHT,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **1:24-cv-00808** |
| | ) | |
| **URBAN ONE, INC.,** | ) | |
| SERVE: | ) | |
| R/A Corporation Service Company | ) | |
| 100 Shockoe Slip | ) | |
| Floor 2 | ) | |
| Richmond, VA 23219 | ) | |
| Defendant. | ) | |

## COMPLAINT

The Plaintiff, **NYREE WRIGHT** ("Ms. Wright"), by counsel, moves for judgment

against Defendant, **URBAN ONE, INC.,** ("Urban One" or "Defendant") on the grounds and the

amount as hereafter set forth:

### JURISDICTION AND VENUE

1.      Ms. Wright is a resident of the Commonwealth of Virginia.

2.      Defendant is an entity authorized to transact business in Virginia, with its

principle place of business in Silver Springs Maryland.

3.      This action is brought against Defendant pursuant to two violations of Va. Code §

2.2-3905(B) due to race and sex based discrimination.

4.      Ms. Wright filed a Charge of Discrimination with the Office of Civil Rights who

transferred her case to the Equal Employment Opportunity Commission ("EEOC").

5.      Ms. Wright received her right to sue letter from the EEOC on February 23, 2024.

## PARTIES

6.     Ms. Wright is an individual and resident of the Commonwealth of Virginia.

7.     Defendant is a business registered to conduct business in the Commonwealth of Virginia and employs personnel, such as Ms. Wright, within the Commonwealth of Virginia.

## FACTUAL BACKGROUND

8.     Ms. Wright is an African American woman.

9.     Ms. Wright worked for Defendant for over a year and a half, beginning in August 2021.

10.     Ms. Wright is aware that other supervisors and executives, including founder of Urban One, Cathy Hughes, direct racial epithets toward employees because they are Black.

11.     In August 2022, Ms. Wright's supervisor, Michelle Rice, approached Ms. Wright and asked Ms. Wright to tell another Black female employee, Charnelle Anderson, to remove her cornrow braids.

12.     Ms. Rice stated to Ms. Wright that Charnelle Anderson "look[ed] like Allan Iverson" because she was wearing cornrow braids.

13.     Michelle Rice compared Charnelle Anderson to Allan Iverson, a Black male professional athlete, because Ms. Anderson is Black.

14.     Ms. Rice stated that she was concerned that Ms. Hughes might see Charnelle Anderson's hair because in the past Ms. Hughes had fired multiple Black employees because of their appearance.

15.     Ms. Wright refused her supervisor's order to instruct Charnelle Anderson that she could not wear cornrow braids as it was not her role to do so and stated perhaps Human Resources should be involved.

16.     Ms. Rice informed Ms. Wright that Ms. Hughes has referred to Black female employees as "pickaninny" on several occasions.

17.     Ms. Wright witnessed Ms. Rice and other supervisors and executives direct derisive racial comments toward and about employees' hair and clothing because they are Black and female.

18.     Ms. Wright witnessed supervisors and executives refer to other employees with sexist remarks because they are Black and female.

19.     On or around November 28, 2022, the Public Relations (PR) Manager deployed a news release as part of the communications strategy surrounding Defendant's annual awards production.

20.     The entire enterprise was severely late in promoting the event and there was a sense of urgency to begin PR activities.

21.     The PR manager, whose main role includes deploying news releases on behalf of the Defendant, issued the communications.

22.     A few hours later, Ms. Wright was alerted that there was a minor error in the news release.

23.     Ms. Wright quickly resolved any potential issues the error might have caused and there was absolutely no fallout or negative consequence.

24.     Ms. Hughes stated to Ms. Rice that the error was Ms. Wright's fault.

25.      On December 13, 2022, Ms. Rice informed Ms. Wright that Ms. Hughes had been "on a kick" about firing people, including Ms. Wright, as a result of ongoing stress in Ms. Hughes' personal life.

26.     Ms. Rice stated, "She is like a dog with a bone," referring to Ms. Hughes' efforts to have Ms. Wright terminated.

27.     Ms. Rice assured Ms. Wright that the new release error was "not a fireable offense" and that Ms. Rice stated that very same thing to Ms. Hughes.

28.     Ms. Hughes applied a higher standard of discipline to Ms. Wright because of her race and sex.

29.     Similarly situated individuals of another race or sex were not subjected to this same standard of discipline. One example of this is from the treatment of: Charnelle Anderson, Senior Vice President of Marketing, a colleague of Ms. Wright. On April 16, 2022, her team, who is responsible for the network's advertising, published an advertisement for an upcoming TV One Network film, "Stalker". After already being told by the Talent Department that the name of one of the main stars listed in the ad was misspelled, it was still published/deployed to the public. The star of the film's name is Christian KEYES but his name was printed on the ad/promotional materials as Christian KEYS. Ms. Anderson was never reprimanded and remained employed with the network.

30.     Ms. Rice assured Ms. Wright that other senior leaders, including Defendant's Chief Administrative Officer and Senior Vice President of Production, vouched for Ms. Wright and the "great work" Ms. Wright had been doing for the company to Ms. Hughes.

31.     Ms. Rice stated that Ms. Wright was only the latest target of Ms. Hughes' discrimination and unfair treatment.

32.     Ms. Rice encouraged Ms. Wright to reach out to her mentor, a friend of Ms. Hughes, to "socialize the projects you're leading to Ms. H."

33.     On February 1, 2023, Ms. Wright followed her supervisor's instruction to contact her mentor, Dyana Williams.

34.     Unbeknownst to and unsolicited by Ms. Wright, Ms. Williams contacted Ms. Hughes and advocated for Ms. Wright.

35.     Following her conversation with Ms. Williams, Ms. Hughes contacted Ms. Rice and made a statement to the effect of Ms. Wright spoke about company business outside of the company.

36.     On February 21, 2023, Defendant separated Ms. Wright's employment.

37.     Defendant told Ms. Wright that she was being terminated for "the news release error and your bad choices in judgment" for speaking to Ms. Williams about the ongoing issues.

38.     Defendant terminated Ms. Wright for expressing the discrimination she was facing within the workplace.

39.     Defendant terminated Ms. Wright in substantial part because of her race and sex.

40.     Similarly situated individuals of another race or sex were not subjected to this same standard of discipline.

41.     Ms. Wright never received disciplinary counselling and received outstanding reviews of her work both verbally and in writing.

42.     Defendant refused to take substantive action to stop the discrimination Ms. Wright faced in the workplace.

43.     Defendant terminated Ms. Wright in substantial part because of her race and sex.

44.     Ms. Wright filed a Complaint with the Virginia Office of the Attorney General Office of Civil Rights ("OCR") in April 2023.

45.     The OCR transferred Ms. Wright's charge to the Equal Employment

Opportunities Commission ("EEOC").

46.     The EEOC issued Ms. Wright a Notice of Right to Sue on February 23, 2024.

(Exhibit A).

## COUNT I: VIOLATION OF VA CODE § 2.2-3905(B)
### (On the basis of race)

47.     Ms. Wright incorporates all prior allegations.

48.     Va. Code § 2.2-3905(B) states that "[i]t is an unlawful discriminatory practice for

[a]n employer to [f]ail or refuse to hire, discharge, or otherwise discriminate against any

individual with respect to such individual's compensation, terms, conditions, or privileges of

employment because of such individual's . . . race."

49.     Ms. Wright is African American.

50.     Ms. Wright experienced discrimination by Defendant's employees based on her

race.

51.     Ms. Wright witnessed supervisors and executives direct racial epithets toward

employees because they are Black.

52.     In August 2022, Ms. Wright's supervisor, Michelle Rice, approached Ms. Wright

and asked Ms. Wright to tell another Black female employee, Charnelle Anderson, to remove her

cornrow braids.

53.     Ms. Rice stated to Ms. Wright that Charnelle Anderson "look[ed] like Allan

Iverson" because she was wearing cornrow braids.

54.     Michelle Rice compared Charnelle Anderson to Allan Iverson, a Black male

professional athlete, because Ms. Anderson is Black.

55.     Ms. Rice stated that she was concerned that Ms. Hughes might see Charnelle Anderson's hair because in the past Ms. Hughes had fired multiple Black employees because of their appearance.

56.     Ms. Wright refused her supervisor's order to instruct Charnelle Anderson that she could not wear cornrow braids.

57.     Ms. Rice informed Ms. Wright that Ms. Hughes has referred to Black female employees as "pickaninny" on several occasions.

58.     Ms. Wright witnessed other supervisors and executives direct derisive racial comments toward and about employees' hair and clothing because they are Black and female.

59.     Ms. Wright witnessed supervisors and executives refer to other employees with sexist remarks because they are Black and female.

60.     On or around November 28, 2022, the Public Relations (PR) Manager deployed a news release as part of the communications strategy surrounding Defendant's annual awards production.

61.     The entire enterprise was severely late in promoting the event and there was a sense of urgency to begin PR activities.

62.     The PR manager whose role includes deploying news releases on behalf of the Defendant issued the communications.

63.     A few hours later, Ms. Wright was alerted that there was a minor error in the news release.

64.     Ms. Wright quickly resolved any potential issues the error might have caused.

65.     Ms. Hughes stated to Ms. Rice that the error was Ms. Wright's fault.

66.     On December 13, 2022, Ms. Rice informed Ms. Wright that Ms. Hughes had been "on a kick" about firing people, including Ms. Wright, as a result of ongoing stress in Ms. Hughes' personal life.

67.     Ms. Rice stated, "She is like a dog with a bone," referring to Ms. Hughes' efforts to have Ms. Wright terminated.

68.     Ms. Rice assured Ms. Wright that the new release error was "not a fireable offense" and that Ms. Rice stated that very same thing to Ms. Hughes.

69.     Ms. Hughes applied a higher standard of discipline to Ms. Wright because of her race.

70.     Similarly situated individuals of another race were not subjected to this same standard of discipline.

71.     Ms. Rice assured Ms. Wright that other senior leaders, including Defendant's Chief Administrative Officer and Senior Vice President of Production, vouched for Ms. Wright and the "great work" Ms. Wright had been doing for the company to Ms. Hughes.

72.     Ms. Rice stated that Ms. Wright was only the latest target of Ms. Hughes' discrimination and unfair treatment.

73.     Ms. Rice encouraged Ms. Wright to reach out to her mentor, a friend of Ms. Hughes, to "socialize the projects you're leading to Ms. H."

74.     On February 1, 2023, Ms. Wright followed her supervisor's instruction to contact her mentor, Dyana Williams.

75.     Unbeknownst to Ms. Wright, Ms. Williams contacted Ms. Hughes and advocated for Ms. Wright.

76.     Following her conversation with Ms. Williams, Ms. Hughes contacted Ms. Rice and made a statement to the effect of Ms. Wright spoke about company business outside of the company.

77.     On February 21, 2023, Defendant separated Ms. Wright's employment.

78.     Defendant told Ms. Wright that she was being terminated for "the news release error and your bad choices in judgment" for speaking to Ms. Williams about the ongoing issues.

79.     Defendant terminated Ms. Wright for expressing the discrimination she was facing within the workplace.

80.     Defendant terminated Ms. Wright in substantial part because of her race.

81.     Similarly situated individuals of another race were not subjected to this same standard of discipline.

82.     Ms. Wright never received disciplinary counselling and received high praise for her work both verbally and in writing.

83.     Defendant refused to take substantive action to stop the discrimination Ms. Wright faced in the workplace.

84.     Ms. Wright was belittled and humiliated by Defendant on the basis of her race when she was exposed to the aforementioned discriminatory conduct.

85.     Va. Code § 2.2-3905(B) makes it unlawful to allow race to be a motivating factor for any employment practice.

86.     During the course of Ms. Wright's employment, Defendant, by and through its agents and employees, discriminated against Ms. Wright in the compensation, terms, conditions, and privileges of her employment in various ways, in substantial part because of her race, in violation of Va. Code § 2.2-3905(B).

87.     The above described unwelcome race discrimination throughout Ms. Wright's employment interfered with Ms. Wright's physical and emotional well-being as well as her ability to earn money.

88.     As a result of the hostile, offensive and discriminatory behavior by Defendant, and its agents and employees, and the failure of Defendant to protect Ms. Wright from such discrimination and retaliation, Ms. Wright suffered humiliation, emotional stress and physical pain.

89.     Defendant, through its agents and/or employees failed to adequately supervise, control, discipline and/or otherwise penalize the conduct, acts and failures to act as described above with respect to the race discrimination suffered by Ms. Wright.

90.     Defendant failed to take all necessary and reasonable steps to eliminate race discrimination from the workplace and to prevent it from occurring in the future.

91.     Because Defendant violated Va. Code § 2.2-3905(B), as described above, Ms. Wright has retained counsel, in an effort to protect her rights with respect to work environment and hiring/firing practices maintained by Defendant. As a result of retaining legal counsel because of Defendant's actions, Ms. Wright has incurred and will continue to incur legal fees and costs, the full nature and extent of which are presently unknown to Ms. Wright.

### COUNT II: VIOLATION OF VA CODE § 2.2-3905(B)
### (On the basis of sex)

92.     Ms. Wright incorporates all prior allegations.

93.     Va. Code § 2.2-3905(B) states that "[i]t is an unlawful discriminatory practice for [a]n employer to [f]ail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's . . . sex."

94.     Ms. Wright is a woman.

95.     Ms. Wright experienced discrimination by Defendant's employees based on her sex.

96.     In August 2022, Ms. Wright's supervisor, Michelle Rice, approached Ms. Wright and asked Ms. Wright to tell another Black female employee, Charnelle Anderson, to remove her cornrow braids.

97.     Ms. Rice stated to Ms. Wright that Charnelle Anderson "look[ed] like Allan Iverson" because she was wearing cornrow braids.

98.     Ms. Wright refused her supervisor's order to instruct Charnelle Anderson that she could not wear cornrow braids.

99.     Ms. Rice informed Ms. Wright that Ms. Hughes has referred to Black female employees as "pickaninny" on several occasions.

100.    Ms. Wright heard other supervisors and executives direct derisive racial comments toward and about employees' hair and clothing because they are Black and female.

101.    Ms. Wright witnessed supervisors and executives refer to other employees with sexist remarks because they are Black and female.

102.    On or around November 28, 2022, the Public Relations (PR) Manager deployed a news release as part of the communications strategy surrounding Defendant's annual awards production.

103.    The entire enterprise was severely late in promoting the event and there was a sense of urgency to begin PR activities.

104.    The PR manager whose role includes deploying news releases on behalf of the Defendant issued the communications.

105.    A few hours later, Ms. Wright was alerted that there was a minor error in the news release.

106.    Ms. Wright quickly resolved any potential issues the error might have caused.

107.    Ms. Hughes stated to Ms. Rice that the error was Ms. Wright's fault.

108.    On December 13, 2022, Ms. Rice informed Ms. Wright that Ms. Hughes had been "on a kick" about firing people, including Ms. Wright, as a result of ongoing stress in Ms. Hughes' personal life.

109.    Ms. Rice stated, "She is like a dog with a bone," referring to Ms. Hughes' efforts to have Ms. Wright terminated.

110.    Ms. Rice assured Ms. Wright that the new release error was "not a fireable offense" and that Ms. Rice stated that very same thing to Ms. Hughes.

111.    Ms. Hughes applied a higher standard of discipline to Ms. Wright because of her sex.

112.    Similarly situated individuals of another sex were not subjected to this same standard of discipline.

113.    Ms. Rice assured Ms. Wright that other senior leaders, including Defendant's Chief Administrative Officer and Senior Vice President of Production, vouched for Ms. Wright and the "great work" Ms. Wright had been doing for the company to Ms. Hughes.

114.    Ms. Rice stated that Ms. Wright was only the latest target of Ms. Hughes' discrimination and unfair treatment.

115.    Ms. Rice encouraged Ms. Wright to reach out to her mentor, a friend of Ms. Hughes, to "socialize the projects you're leading to Ms. H."

116.    On February 1, 2023, Ms. Wright followed her supervisor's instruction to contact her mentor, Dyana Williams.

117.    Unbeknownst to and unsolicited by Ms. Wright, Ms. Williams contacted Ms. Hughes and advocated for Ms. Wright.

118.    Following her conversation with Ms. Williams, Ms. Hughes contacted Ms. Rice and made a statement to the effect of Ms. Wright spoke about company business outside of the company.

119.    On February 21, 2023, Defendant separated Ms. Wright's employment.

120.    Defendant told Ms. Wright that she was being terminated for "the news release error and your bad choices in judgment" for speaking to Ms. Williams about the ongoing issues.

121.    Defendant terminated Ms. Wright for expressing the discrimination she was facing within the workplace.

122.    Defendant terminated Ms. Wright in substantial part because of her sex.

123.    Similarly situated individuals of another sex were not subjected to this same standard of discipline.

124.    Ms. Wright never received disciplinary counselling and received outstanding performance reviews.

125.    Defendant refused to take substantive action to stop the discrimination Ms. Wright faced in the workplace.

126.    Ms. Wright was belittled and humiliated by Defendant on the basis of her sex when she was exposed to the aforementioned discriminatory conduct.

127.    Va. Code § 2.2-3905(B) makes it unlawful to allow sex to be a motivating factor for any employment practice.

128.     During the course of Ms. Wright's employment, Defendant, by and through its agents and employees, discriminated against Ms. Wright in the compensation, terms, conditions, and privileges of her employment in various ways, in substantial part because of her sex, in violation of Va. Code § 2.2-3905(B).

129.     The above described unwelcome sex-based discrimination throughout Ms. Wright's employment interfered with Ms. Wright's physical and emotional well-being as well as her ability to earn money.

130.     As a result of the hostile, offensive and discriminatory behavior by Defendant, and its agents and employees, and the failure of Defendant to protect Ms. Wright from such discrimination and retaliation, Ms. Wright suffered humiliation, emotional stress and physical pain.

131.     Defendant, through its agents and/or employees failed to adequately supervise, control, discipline and/or otherwise penalize the conduct, acts and failures to act as described above with respect to the sex-based discrimination suffered by Ms. Wright.

132.     Defendant failed to take all necessary and reasonable steps to eliminate sex-based discrimination from the workplace and to prevent it from occurring in the future.

133.     Because Defendant violated Va. Code § 2.2-3905(B), as described above, Ms. Wright has retained counsel, in an effort to protect her rights with respect to work environment and hiring/firing practices maintained by Defendant. As a result of retaining legal counsel because of Defendant's actions, Ms. Wright has incurred and will continue to incur legal fees and costs, the full nature and extent of which are presently unknown to Ms. Wright.

**WHEREFORE, the Plaintiff NYREE WRIGHT, respectfully requests that this Court:**

A.      Enter judgement in the amount of $750,000.00 in favor of Ms. Wright and against Defendant for its conduct in violation of her rights under Va. Code § 2.2-3905(B);

B.      Compensatory damages in the amount of $400,000.00 including lost wages, back pay, past and future impairment of power to earn money, and emotional distress;

C.      Punitive damages of $350,000.00 against Defendant for its intentional and malicious conduct;

D.      A permanent injunction against future acts of discrimination against Ms. Wright;

E.      Costs expanded herein, including reasonable attorneys' fees as allowed under the Va. Code § 2.2-3905(B);

F.      Pre-judgment and post-judgment interests; and

G.      Award her such other and further relief, as the Court deems just and equitable.

**TRIAL BY JURY IS REQUESTED.**

NYREE WRIGHT
By Counsel

SUROVELL ISAACS & LEVY PLC

By: _____ **/s/ Jason F. Zellman** _____
        Jason F. Zellman, Esquire, VSB #77499
        Maxfield B. Daley-Watson, Esquire, VSB #99315
        4010 University Drive, Second Floor
        Fairfax, Virginia 22030
        Telephone: 703.277.9704
        Facsimile: 703.591.9285
        Email: JZellman@SurovellFirm.com
        Email: MWatson@SurovellFirm.com
        *Counsel for Ms. Wright*